UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BOSS LADY ADVENTURES, LLC | CIVIL ACTION NO. 2:22-cv-00170 L (2) |
| VERSUS | JUDGE ELDON E. FALLON |
| PORTIER FABRICATION, LLC; ROBBIE PORTIER; AND ASHLEY C. PORTIER | MAG. DONNA PHILLIPS CURRAULT |

**ORDER AND REASONS**

Before the Court is Defendant Portier Fabrication, LLC's motion to dismiss due to improper venue, R. Doc. 56. After considering the motion, opposition, and parties' testimony at oral argument, the Court now rules as follows.

I. **BACKGROUND**

Boss Lady Adventures, LLC ("Boss Lady"), a company domiciled in Florida, approached Portier Fabrication, LLC ("Portier Fabrication"), a company domiciled in Louisiana, to discuss the possibility of Portier Fabrication constructing a vessel for Boss Lady. R. Doc. 1 at 1-3. On July 23, 2017, Boss Lady entered into a contract with Portier Fabrication for Portier Fabrication to construct a 78-foot steel fishing vessel to be named "Boss Lady" for a quoted price of $410,000. *Id.* at 3. Boss Lady claims to have entered into this contract with the understanding, as represented by Defendant Robbie Portier, that he and his business had over 40 years of experience building vessels of the kind desired by Boss Lady. *Id.*

On March 6, 2019, the parties entered into a "Phase 2 Agreement" defining the parties' obligations in the second phase of the vessel's construction. *Id.* at 3-4. Pursuant to the Phase 2 Agreement, the parties shifted from a fixed price to a time and materials contract. *Id.* According to Boss Lady, disputes arose over delays and type of work performed by Portier and on May 25,

1

2020, Boss Lady issued a cease-and-desist notice to Portier Fabrication instructing Portier to cease all work on the vessel until the parties could resolve the disputes that had arisen. *Id*. at 4. Apparently, the parties could not resolve their disputes and on February 1, 2021, Boss Lady informed Portier Fabrication that it intended to take possession of the vessel and have it inspected for deficiencies and completed by a third-party. *Id*. The record shows that after a period of negotiation, the parties entered into an agreement termed the "Vessel Construction Separation Agreement" (the "Separation Agreement" or "Agreement"), which was signed by Boss Lady's representative on October 8, 2020, and by Portier Fabrication's representative on October 12, 2020. R. Doc. 12 at 5–11. The Separation Agreement laid out the terms of the dissolution of the parties' relationship and transfer of the incomplete vessel from Portier Fabrication to Boss Lady. *Id.* Ultimately, on February 3, 2021, Portier Fabrication issued a Bill of Sale and Builder's Certificate and transferred the vessel to Boss Lady. R. Doc. 1 at 4.

After taking possession, Boss Lady contracted with a third-party boat builder who inspected the vessel and identified numerous problems in its construction. *Id*. The third-party boat builder identified the following deficiencies and defects in the work allegedly performed by Portier Fabrication:

a.  The vessel's hull foam had been improperly installed, for which Plaintiff paid Portier Fabrication $18,000, requiring its removal and reinstallation;

b.  The vessel's hull had been improperly rust-treated, requiring its re-treatment and repainting;

c.  The main fuel tanks failed a pressure test due to insufficient baffle installation and serious issues in the vessel's structural integrity;

d.  Subsequent repairs to the fuel tanks requiring corresponding removal and repair of the deck;

e.  Improper welds on the hull's structure which needed to be redone;

f.  Floor grates were improperly installed so as to prevent their removal for access to below-deck spaces. This required their removal, re-welding, and reinstallation;

g.  The vessel's engine, which Portier Fabrication claimed was fully installed and billed Boss Lady accordingly in the amount of $36,000, was not in fact installed at all. Rather, it was merely placed inside the hull. This required extensive cutting, welding, reinstallation and reconfiguration of major structural components of the hull;

h.  Portier Fabrication likewise billed Boss Lady $15,000 to install the vessel's generator, but did not in fact do so. Rather, the generator was merely placed inside the vessel with no subsequent installation work;

i.  The vessel's swim platform was not properly welded, requiring subsequent sandblasting, corrective welding, and painting;

j.  The vessel's manhole covers failed pressure testing, requiring subsequent repairs;

k.  The vessel's rudder room steering components were improperly installed, requiring subsequent repairs and reconfiguration of the rudder room's jockey bar;

l.  There were structural integrity issues identified throughout the vessel's upper, main, and lower deck ceilings and the upper deck's walkway; requiring the removal of large portions of the vessel's wooden floor boards to install reinforcing structural steel with the additional design input of a naval architect;

m.  The vessel's salon room's stripping, for which Boss Lady paid Portier Fabrication $13,000, was incorrectly installed, requiring its total replacement;

n.  The vessel was transferred to Boss Lady upon termination of the parties' contract in need of a total exterior paint job;

o.  All steel fasteners in the vessel's floors, ceilings, and walls were improperly installed,

      requiring their total replacement; and

  p.  The fuel, water, and oil tanks installed on the vessel deviated from Boss Lady's specifications and were smaller than those required to operate the vessel in the manner specified by Boss Lady, requiring their replacement.

*Id*. at 5-6.

Upon learning of these deficiencies, Boss Lady began contracting with other third parties to correct the deficiencies. *Id*. at 6. Boss Lady claims over $75,000 in damages based on the cost of obtaining services to repair the vessel as well as direct losses from Portier Fabrication's performance under the Builder Contract and Phase 2 Agreement. *Id*. at 7. Boss Lady further claims that Portier Fabrication billed them for actions in constructing the vessel that were done improperly and thus have to be repaired or re-installed, and that Portier Fabrications fabricated time sheets, work orders, and invoices for incomplete work or work actually completed on unrelated vessels. *Id.*

Boss Lady filed the instant suit in January 2022 in the U.S. District Court for the Eastern District of Louisiana on the basis of diversity jurisdiction. Accordingly, Boss Lady claims that Portier Fabrication is liable for breach of contract, breach of warranty of workmanlike performance, unjust enrichment, intentional misrepresentation, redhibition, fraud, and violation of the Louisiana Unfair Trade Practices and Consumer Protection Act. *Id.* at 8-14. Boss Lady further claims that Ashley Portier and Robbie Portier are liable for intentional misrepresentation and fraud. *Id.* at 15-16.

## II.   EARLIER MOTION

On February 16, 2022, before discovery began, Defendants filed a motion to dismiss pursuant to Rule 12(b)(3), arguing lack of venue. R. Doc. 12. In that motion, Defendants argued that the forum selection clause in the Separation Agreement between the parties requires Plaintiff's

claims to be brought in the 32nd Judicial District Court of Terrebonne Parish, Louisiana. They argued that under the terms of the Separation Agreement, that agreement supersedes any previous agreement between the parties; thus, the forum selection clause applies to Boss Lady's claims even though the original Builder Contract between the parties contained no forum selection clause. Boss Lady filed its response on March 8, 2022. R. Doc. 14. Boss Lady argued that (1) the parties did not consent to the Separation Agreement despite having signed it; (2) if they did consent, that consent is vitiate by fraud; (3) if the Separation Agreement is binding, the forum selection clause still does not govern here because Plaintiff's claims do not "arise under" that contract.

In view of an apparent disagreement on the discussions surrounding their negotiations, the Court denied that motion to dismiss without prejudice to Defendants' right to re-urge the motion after more discovery is conducted. R. Doc. 18. In its Order and Reasons, the Court noted that it lacked "enough information on the negotiations and intentions of the parties to decide the issue of whether the Separation Agreement constitutes a valid contract between the parties under Louisiana law." *Id.* The parties engaged in discovery which was completed on June 26, 2023.

### III. PRESENT MOTION

Defendants filed the instant motion on June 30, 2023. This motion, like the earlier one, argues for dismissal for lack of venue. Defendants' argument remains essentially the same as before, that the parties had mutual consent and a meeting of the minds as to the Separation Agreement and thus the forum selection clause governs this dispute. Defendants bolster their arguments with information learned during discovery, specifically relying on the Declaration of Stephen Hanemann and corresponding Exhibits, Declaration of Ashley Portier, and Deposition of Donill Kenney. R. Doc. 56-2 - R. Doc 56-9.

Plaintiff responded on July 11, 2023 with their Memorandum in Opposition, arguing that multiple items of evidence demonstrate the parties did not reach an agreement despite their signing

5

of the Agreement. R. Doc. 59. Plaintiff specifically calls attention to depositions and email exchanges between Plaintiff's former counsel, Jeffrey Cox and Defendants' former counsel Stephen Hanemann, to show the parties knew after the signing date that the Separation Agreement did not represent a meeting of the minds.

The Court heard oral argument on this motion on August 9, 2023 wherein the parties put on live testimony from Stephen Hanemann, Ashley Portier, and Jeffrey Cox.

## IV. LEGAL STANDARD

### a. Rule 12(b)(3)

In considering a Rule 12(b)(3) motion, "the plaintiff has the burden of proving that the chosen venue was proper." *Broussard v. First Tower Loan, LLC*, 135 F. Supp. 3d 540, 544 (E.D. La. 2015). However, courts accept "a plaintiff's well-pleaded factual allegations as true and [draw] all reasonable inferences in plaintiff's favor[,]" *Asevedo v. NBC Universal Media, LLC*, 921 F. Supp. 2d 573, 589 (E.D. La. 2/4/13) (citing *Langton v. Cbeyond Cmmc'n, LLC*, 282 F.Supp 2d 504, 508 (E.D. Tex 2003)), and "must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Centurum Info. Tech. Inc. v. Geocent, LLC*, No. CV 21-0082, 2021 WL 533707, at *3 (E.D. La. Feb. 12, 2021). Accordingly, "the court accepts uncontroverted facts alleged in the complaint as true and resolves conflicts in the parties' affidavits in favor of the plaintiff." *Asevedo*, 135 F. Supp. 3d at 590 (quoting *McCaskey v. Cont'l Airlines, Inc.*, 133 F. Supp. 2d 514, 523 (S.D. Tex. 2001)).

### b. Forum Selection Clauses

Forum selection clauses are presumed enforceable and "where a litigant in federal court attempts to have a case dismissed based on a contractual provision requiring suit to be filed in state court, the forum-selection clause should be upheld unless the party opposing its enforcement can show that the clause is unreasonable." *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*,

536 F.3d 439, 441 (5th Cir. 2008) (citing *Haynsworth v. The Corp.*, 121 F.3d 956, 961 (5th Cir. 1997)). Examples of unreasonableness include when the provision is "overreaching" and "when its enforcement would 'contravene a strong public policy of the forum state." *Id.* (quoting *Haynsworth*, 121 F.3d at 963). It is also unreasonable when the inclusion of the provision in the contract is "the product of fraud." *Haynsworth*, 121 F.3d at 963.

### c. Contract Formation

When evaluating contract formation, Louisiana law requires four elements be satisfied: 1) the parties have capacity to contract, 2) they freely give mutual consent, 3) they have cause or reason to obligate themselves, and 4) the contract has a lawful purpose. *Ingraffia v. NME Hospitals, Inc.*, 943 F.2d 561, 565 (5th Cir. 1991). When demonstrating mutual consent, courts look for "a mutual understanding of facts and of subject matter" and that the agreement "afford[s] a complete expression of this meeting of the minds, and leave[s] no material element unexpressed. . . . [T]he result must be a complete obligation." *Thompson v. State Farm Ins. Co.*, 145 F. Supp. 473, 483 (W.D. La. 1956) (citing *Jones v. Janes*, 101 So. 116, 117 (La. 1924)).

That parties sign an agreement is not alone determinative as to mutual consent when there is evidence that a party to the contract clearly negates the consent. *Ingraffia*, 943 F.3d at 566. For example, in *Ingraffia v. NME Hospitals, Inc.*, the Fifth Circuit held a contract signed by both parties was invalid for lack of mutual consent because the second-signing party attached a proposed amendment and a statement of his superior stating the unamended language was unacceptable. *Id.* That case involved a physician's service contract with a hospital. The court found that while the physician "might have thought that the signed document containing his version of the agreement would be legally sufficient to protect him if a conflict arose[,] [h]e could not, however, have believed that the parties mutually consented to the terms of that document because when he received the document, he also received and read a clear statement negating such

7

consent." *Id.* The court thus found "no meeting of the minds between the parties on the contract" even though both parties had physically signed the document. *Id.*

### d. Mistake

A contract may be invalid if the parties' make a mistake that negates consent. The Restatement (Second) of Contracts defines mistake as "an erroneous belief," including "[a]n erroneous belief as to the *contents* or *effect* of a writing that expresses the agreement." RESTATEMENT (SECOND) OF CONTRACTS, § 151(a) (AM. L. INST. 1981). (emphasis added). Mistake may be mutual, such as when "a mistake [is] shared by both parties to the instrument at the time of reducing their agreement to writing, and . . . the contract has been written in terms which violate the understanding of both parties; that is, if it appears that both have done what neither intended." *Fireman's Fund Ins. Co. v. Bulliard Farm, Inc.*, 915 So. 2d 1014, 1017 (La. App. 3 Cir. 11/2/05) (quoting Teche Realty & Inv. v. Morrow, 673 So. 2d 1145, 1147 (La. App. 3 Cir. 4/17/96). If a court finds mutual mistake occurred, it may rescind the contract and thus find it unenforceable. *See Semco, LLC v. Grand Ltd.*, 221 So. 3d 1004, 1030 (La. App. 5 Cir. 5/31/17).

Unilateral mistake, on the other hand, "standing alone does not vitiate" a contract. *See Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 387, 392 (5th Cir. 1984) (describing how misrepresentation by one party may affect the analysis). In *Mid-South Towing Co. v. Har-Win Inc.*, one party sought to escape a settlement agreement arguing, among other things, that had its counsel known of additional surveys at the time of signing, he would not have approved the settlement. *Id.* at 391. The Fifth Circuit, affirming the Eastern District of Louisiana's finding, found this error to be "at most, a unilateral mistake" and held that "a unilateral mistake of fact is not a basis for avoidance of a settlement agreement" and in doing so specifically noted that there was "no claim that either Mid-South or American Employers' concealed these other surveys or misrepresented their contents." *Id.* at 391-92. Absent such misrepresentation or fraud, a unilateral mistake will

not be grounds to avoid a contract. *Id.*

## V. DISCUSSION

At the hearing held on August 9, 2023, Mr. Hanemann, Defendant's attorney, testified that the Separation Agreement went through several iterations. In an earlier version, Paragraph 3 included the following sentence:

> Following the execution of the Protocol of Delivery and Acceptance, Builder shall have no liability to Owner in any respect, and Builder shall have no further obligations to Owner save that of the warranty of clear title to the Vessel.

R. Doc. 56-4 at 3. In subsequent versions, Paragraph 3 did not contain this provision. The parties went back and forth on this issue. In any event, the final version did not include this last sentence regarding waiving future claims. Thus, the potential for future claims remained.

Mr. Hanemann testified that he showed the final version of the agreement to Mrs. Portier, a proprietor of the shipyard, and explained it to her pointing out that the final version did not contain the provision waiving future claims. He was convinced she understood it and agreed to it. She signed the final version of the agreement and Mr. Hanemann sent it to the Plaintiff's counsel. Ms. Portier testified she understood the final version and was aware that it did not contain the release of future claims language. In fact, she talked with her husband, the co-owner of the shipyard, and he said, in effect, that it did not matter because if the defendant wanted to sue them he would do it regardless of any waiver. In this regard in answer to the following questions she testified as follows:

> Q: Prior to signing it [referring to the final version of the agreement] did you discuss it with your husband?
> A: Yes.
> Q: Were you aware that some of the language of previous drafts had been taken out?
> A: Yes.
> Q: And you were okay with that?
> A: Yes. Rob [her husband] and I had a particular question and I said they removed this section in particular, talks about future litigation. He says if he wants to sue

9

us, he's going to sue us anyway. He said let's get rid of the boat and sign it.

Transcript of Oral Argument (Tr.) at 61:19-62:5. Her attorney, Mr. Hanemann, confirmed this understanding when he testified as follows:

> Q: I understand was your conversation with Ashley after that e-mail?
> A: Yes.
> Q: Okay.
> A: But it didn't effect - - I mean it did not impact Portier Fabrication's understanding that they had signed and entered a final agreement.
> Q: Okay. And did they understand at that time that Boss Lady still retained the right to pursue claims against them?
> A: I am certain they did but they will have to tell you what they understood.
> Q: Did you advise your clients of that fact?
> A: I advised my clients that the language that eliminated the possibility of a future lawsuit had been removed from the agreement and they knew that and agreed to it when they signed it.

Tr. 37:18 – 38:9

In any event, the evidence indicates that shortly after signing the agreement Ms. Portier had second thoughts, so called "buyer's remorse," and wished she had not signed the agreement on those terms. She called her attorney and asked him to call Plaintiff's counsel and try to change the agreement to include the future claims waiver. In this regard, she testified as follows:

> Q: Okay. At some point later, did you have a telephone call with Mr. Hanemann?
> A: Yes.
> Q: Okay. What was the nature of that call, did you call him or did he call you?
> A: I'm sure I called him. I think we just talked about because in that – in the final agreement it said something about adding amendments so we talked about changing some things and it was more than one thing, I don't remember what it was in particular and then we started getting back e-mails saying they're pursuing litigation and all of these different claims that they're making and I don't know what he discussed but that was our discussion.

Tr. 64:2-64:15. This caused Mr. Hanemann to call Plaintiff's counsel to carry out Defendant's request. Defendant's counsel testified that his intent was to try to amend the contract and not negate it. On the other hand, Plaintiff's counsel, Mr. Cox concluded that Ms. Portier was claiming she executed the contract by mistake and wanted to continue to negotiate. Regarding this effort to

10

carry out Ms. Portier's request and communicate this to Mr. Cox, Mr. Hanemann testified as follows:

> Q: So it's - - can you explain to me what it was that you were negotiating in October 15, 2020, if you had already reached a final and fully executed agreement?
> A: Sure. We talked I think before or in conjunction with this agreement at least once before and I said look, my clients want to revisit this. They accept it the way it is but they want to make sure they're not going to get sued and then he [Mr. Cox] mentioned very specifically well, look, we really can't do that because our clients are kind of contemplating this counterclaim and they want to pursue it and they might need to flesh that out. So that changed. You need to understand the nature of these negotiations. That changed the entire tenor of what was happening here. The agreement was done. Okay? . . . [T]o make it better in the context of someone just saying for the first time they might bring an accounting claim, it's worth the effort to try and alter that agreement.

Tr. 41:15 – 42:19.

The issue central to Portier Fabrication's motion is whether the parties reached consent as to the Final Agreement such that the forum selection clause contained therein applies to this action. In *Ingraffia*, the Fifth Circuit invalidated a contract for lack of consent, notwithstanding the fact that it had been signed by all parties. *Ingraffia*, 943 F.3d at 566. There, the court explained, although all parties had signed the contract, correspondence between them indicated that one party to the contract intended for a yet-unsigned amendment that it attached to the signed contract to be approved as a prerequisite for its consent. *Id.* at 565-566. Because that party had sent the signed contract along with a letter stating that an included revision was unacceptable and needed to be replaced with a new amendment attached to the contract, the other party was on notice that mutual consent had not occurred between them. Notwithstanding the fact that the contract was fully signed, "there was no meeting of the minds. Both parties realized they did not agree." *Id.* at 566.

Boss Lady argues that the same applies in this case. It points to the phone call its counsel received later the same day that Ashley Portier signed the Final Agreement, where Portier Fabrication's counsel explained that Ashley signed an incorrect version of the Agreement. *See* R.

11

Doc. 59-1 at 2, ¶ 6. (Portier's counsel disputes this claim. Tr. 52:23 – 53:5 ("But I've since seen the pleadings filed in this case that it has been offered by him and perhaps will be offered by him and his testimony that I said words that would intimate that my client signed something in error or signed the wrong draft. I certainly know I did not say that. I did not use the word error in that conversation and I did not say wrong agreement.")) Boss Lady also points to emails exchanged between the parties after both parties signed the Separation Agreement and claims that this correspondence demonstrates that mutual consent had not occurred, and that both parties realized this despite having the signed Separation Agreement.

However, Ms. Portier testified under oath that when she called Mr. Hanemann on the evening of October 12, 2020, she did not tell him that she mistakenly signed an incorrect version of the contract. She described to the Court that she knew exactly what she was signing and that she asked her attorney that evening only about the process for *amending* the Agreement, which the Agreement expressly permitted. The Court found her testimony credible.

Further, the Court notes an important distinguishing factor between the facts at bar and *Ingraffia*. Here, Ms. Portier did not return the signature page contemporaneously with a note or amendment or other notice that the absence of a future claims waiver was unacceptable, thereby alerting Boss Lady that mutual consent had not been achieved as to the signed document. Instead, several hours later, she explored with her attorney how to amend the Agreement. Notwithstanding the differing recollections of counsel as to the purpose of these after-signing negotiations, Ms. Portier remained steadfast as to her intent to sign the Agreement as it was. Boss Lady may urge that this may be considered a unilateral mistake on the part of Ms. Portier, but her testimony negates this understanding of events. While Ms. Portier may have changed her mind after signing and upon learning about the potential imminence of future litigation, like the attorney in *Mid-South Towing Co.* who would not have signed that settlement had he known of additional surveys, this

does not constitute mistake. Even if it had been a unilateral mistake, the law is clear that unilateral mistake will not be enough to void a contract absent some evidence of fraud or misrepresentation on the part of Boss Lady, evidence of which is absent in this case. *See Mid-South Towing Co.*, 733 F.2d at 392.

After considering the evidence, it is clear to the Court that after signing the final agreement Ms. Portier had second thoughts and reached the conclusion that she had made a mistake in signing the agreement without the provision waiving future claims. But at the time she signed the final agreement, she understood that it did not contain this provision and made the decision to sign it anyway, assuming the risk of future claims. The final agreement is a valid contract. The fact that she changed her mind after signing the agreement cannot retroactively negate it or make it invalid.

Paragraph 18 of the Separation Agreement contained a forum selection clause which designates the 32nd Judicial District Court of Terrebonne Parish, Louisiana and provides as follows:

> This Agreement and all transactions contemplated by this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Louisiana, excluding the conflicts of laws principles thereof. The venue of any action arising from this Agreement shall lie exclusively in the 32nd Judicial District Court of Terrebonne Parish, Louisiana, and the Parties shall submit to the jurisdiction of such court.

R. Doc. 12-2 at 6. The case law is clear that a forum selection clause is presumed enforceable unless a party can show it was unreasonable (by virtue of fraud, public policy, or otherwise). Here, no such showing has been made.

Paragraph 19 of the Separation Agreement also includes a provision stating that this Agreement "constitutes the entire agreement between the Parties and supersedes any prior agreement or understanding between them, oral or written, on the subject matter." *Id.* Accordingly, Boss Lady's contention that its claims do not arise under this Agreement are unavailing.

13

For the foregoing reasons, the final agreement is valid and forum selection clause therein governs this suit, and the Court **GRANTS** Defendants' motion to dismiss, without prejudice, so that the matter can proceed in the state forum selected by the parties.

New Orleans, Louisiana, this 14th day of August, 2023.

_____
United States District Judge